| | | |
|---|---|---|
| CONNIE PAYNE, | ) | |
| | ) | |
| *Plaintiff,* | ) | 4:08-cv-92 |
| | ) | |
| v. | ) | Judge Mattice |
| | ) | |
| GOODMAN MANUFACTURING | ) | |
| COMPANY, L.P., | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Defendant Goodman Manufacturing Company, L.P.'s (hereinafter "Defendant") Motion for Summary Judgment (Court Doc. 16) is presently before the Court. Plaintiff Connie Payne (hereinafter "Plaintiff") initiated the instant action against Defendant, which asserts the following claims: (1) interference and retaliation claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; (2) violation of the Tennessee maternity leave statute in the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*; (3) discrimination and retaliation claims in violation of the THRA; and (4) a claim arising under the Equal Pay Act of 1963 (hereinafter "the EPA"), 29 U.S.C. § 201 *et seq.* (Court Doc. 1, Compl. ¶¶ 31-79). The Court's jurisdiction over this matter arises pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332 and is not in dispute.

For the reasons explained below, Defendant's Motion for Summary Judgment (Court Doc. 16) will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may meet this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or by simply " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  To refute such a showing, the nonmoving party may not simply rest on its pleadings.  *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *see Anderson*, 477 U.S. at 249. The nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute.  *Celotex*, 477 U.S.  at 322.  A mere scintilla of evidence is not enough.  *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  The Court's role is limited to determining whether

the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.    FACTS

The facts, taken in the light most favorable to Plaintiff, are as follows.

The Defendant, a manufacturer of commercial and residential heating and air conditioning units, employed Plaintiff for 17 years. (Pl.'s Aff. ¶ 2.) At the time of her termination, Plaintiff was employed in the Information Technology department of Defendant's Fayetteville, Tennessee's plant as a desktop support specialist. (*Id.* ¶ 4.) During Plaintiff's tenure with Defendant, she had worked in the same or similar capacity for a period of 17 years without incident or reprimand. (Hunter Dep. at 12.)

Sometime between February 18, 2004 and February 13, 2006, Plaintiff's official job title was changed from "Computer Operator" to "Desktop Support Specialist." (Pl.'s Att. ¶ 7.) This title change reflected Plaintiff's current job duties, namely computer and telecommunications support. (*Id.* ¶ 8; Court Doc. 17-1, Pl.'s Dep. at 12-13.) Karen Stubblefield, Defendant's IT Director, explained that Plaintiff's title was changed "to offer her the opportunity to become a desktop support person and to expand her capabilities to

improve her position and her job." (Court Doc. 17-3, Stubblefield Dep. at 8.) Stubblefield testified that despite the change in title, however, Plaintiff continued to primarily work on telecommunications tasks. (*Id.* at 31.) Wanda Ford, Defendant's Human Resources Director, testified that she was not even aware that Plaintiff's title changed to include desktop support duties. (Court Doc. 17-4, Ford Dep. at 12.)

In late December 2007, Plaintiff informed her immediate supervisor, Floyd Hunter, that she was pregnant. (Pl.'s Dep. at 68-69.) In late February 2008, Plaintiff informed Defendant's Benefits Administrator that she needed information regarding maternity leave. (*Id.* at 73.) On March 26, 2008, Plaintiff met with the Benefits Administrator and was given the necessary maternity leave paperwork, which was to be returned no later than April 10, 2008. (*Id.* at 73-74.) Plaintiff's physician prepared the maternity leave paperwork and returned it to Defendant on April 9, 2008. (*Id.* at 75.) One week later, Plaintiff informed Hunter of her need for FMLA leave. (*Id.* ¶ 13.)

During the week of April 11, 2008, Plaintiff received her annual performance review from Hunter. During this review, Hunter informed Plaintiff that she was originally given a score of 3.5 out of 4.0. Upon review by Karen Stubblefield, however, Plaintiff's score was lowered to approximately 3.1 out of 4. (*Id.* at 86.)

The parties dispute the reason why Plaintiff's evaluation was lowered by Stubblefield. Plaintiff contends that her review was lowered because Stubblefield took issue with her speaking ability. (Pl.'s Dep. at 91-92.) Hunter, who worked closely with Plaintiff, never informed Plaintiff that there were issues or problems with her speaking ability. (Pl.'s Aff. ¶ 13.) Hunter, however, testified that he agreed with Stubblefield's

changes and that he would have given Plaintiff a worse review but being new "I didn't want to just come in and ruffle feathers." (Hunter Dep. at 79-80.) Stubblefield testified that Plaintiff "needed to improve in areas of communication," including being "assertive." (Stubblefield Dep. at 20-21.) Plaintiff's peers also received downgrades on their reviews due to communication and interpersonal issues. (*Id.*) Stubblefield, however, also testified that Plaintiff needed to "improve her skill set from a desktop perspective." (*Id.*) The other desktop support specialists did not receive this criticism.

The parties agree that Stubblefield's interactions with Plaintiff were limited. Over the course of Plaintiff's career with Defendant, Stubblefield stated that she had roughly seven conversations with Plaintiff. (Stubblefield Dep. at 12-13.) Stubblefield contended that she made adjustments to Plaintiff's review because "I knew more and had more interaction over a longer period of time with [Plaintiff]" than Hunter. (*Id.* at 19-20.)

After Plaintiff received her review, Hunter inquired into whether she would be returning to work following her maternity leave and indicated that Stubblefield needed to know this information. (Pl.'s Dep. at 70.) Hunter testified that he needed this information because he "was trying to figure out who we were going to train ... any time she would be out due to labor and pregnancy, because we didn't know anything about the phone system." (Hunter Dep. at 28-29.)

After receiving her review, Plaintiff expressed dissatisfaction with the amount of her raise. (Pl.'s Aff. ¶ 27.) In response to Plaintiff's concerns, Hunter told Plaintiff she could earn a higher salary by performing more desktop work. (Pl.'s Dep. at 86.) Plaintiff took this statement to imply that she only performed telecommunications work. (*Id.*) In response to Hunter's suggestion, Plaintiff reminded him that she was already tasked with performing

desktop work.  (*Id.*)

Defendant, however, disagrees that Plaintiff had performed an adequate amount of desktop support work.  Although Plaintiff was encouraged to increase her computer knowledge and take on more desktop support duties, her reviews were consistently in the "meets expectations" range and contain repeated requests to improve software and hardware computer skills by obtaining certain technical certifications.  (Court Doc. 17, Def.'s Br. at 5.)  For example, Plaintiff's 2004 review contained a recommendation that she increase her knowledge of computer hardware and software as well as obtain certain computer certifications.  *Id.*  Plaintiff's 2006 and 2007 reviews contained similar requests. *Id.*  Plaintiff, however, admits that she did not obtain any specific software or hardware computer certifications.  *Id.* at 5-6.

During Plaintiff's final review meeting, she informed Hunter that similarly situated employees, Chris Damron and Ryan Shade, received higher wages than her.  (*Id.* 86, 92; Ford Dep at 51.)  In response, Hunter informed Plaintiff that the two men had titles that differed from Plaintiff's title.  (Pl.'s Dep. at 86, 93.)  According to Hunter, Plaintiff had held the position as "Telecom Support Specialist" while Damron and Shade were "Desktop Support Specialists."  (*Id.* at 93.)  Plaintiff immediately informed Hunter that, according to Defendant's corporate office, she held the position of "Desktop Support Specialist" for a period of years.  (*Id.* at 89, 88, 93.)  Hunter, however, did not amend the review in light of this information and did not provide Plaintiff an increase in pay so as to make her salary equivalent to that of  the male Desktop Support Specialists.  (*Id.* at 86, 88, 93.)  Although Hunter admitted that Plaintiff did provide the company desktop support on occasion, he

maintained that she primarily dealt with telecommunication issues. (Hunter Dep. at 30-32.) Hunter also testified that Damron and Shade both had hardware and software certifications and skill sets that Payne did not possess. (Hunter Dep. 71-72; Def.'s Br. at 8.)

In April 2008, Stubblefield was informed of a planned reduction in force and was asked to identify whether there were any employees or positions that her department could eliminate. (Stubblefield Dep. at 33-35.) Stubblefield claimed, however, she "wasn't involved with the actual termination," it "was a surprise" to her, and that she "found out after the fact." (*Id.* at 34.) Stubblefield chose to eliminate Plaintiff's and Jeffrey Cruz's, a branch support analyst, positions. *Id.* She claimed that Plaintiff was chosen because she was the lowest-rated IT person in Fayetteville. (*Id.* at 33-35.) Damron and Shade, Defendant's remaining desktop specialists, did not absorb many of Payne's duties. (*Id.*) Rather, Plaintiff's job duties were outsourced to Avaya, an outside vender, and Jennifer Lehmann, an administrative assistant in Defendant's Houston, Texas office. (*Id.*)

On May 1, 2008, approximately two weeks after Plaintiff requested pregnancy-related FMLA leave and one week after Plaintiff informed her supervisor of her unequal wages, Plaintiff's employment with Defendant was terminated. (Pl. Dep. at 95.) Hunter informed plaintiff that a Desktop Support Specialist position "had to be cut." (*Id.*) Hunter, however, stated that he had no idea a reduction in force was being put into effect and he did not have any role in choosing to terminate Plaintiff's employment.

III.    ANALYSIS

A.    Plaintiff's FMLA Claims

Under the FMLA, an eligible employee is entitled to a total of 12 weeks of leave during any 12-month period to care for a spouse, child, or parent with a "serious health condition" or if the employee has a "serious  health condition" that renders the employee unable to perform the functions of his job. 29 U.S.C. § 2612(a)(1)(C)--(D). A "serious health condition" is a condition that requires inpatient care or continuing treatment by a health care provider. 29 C.F.R. § 825.114(a). To invoke the protections of the FMLA, an employee must give his employer adequate notice and a qualifying reason for requesting FMLA leave. *Hoge v. Honda of Am. Mfg., Inc.*, 384 F. 3d 238, 244 (6th Cir. 2004); *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 723-24 (6th Cir. 2003).  The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of" certain rights created by statute. 29 U.S.C. § 2615(a)(1). Among these statutory rights is the right of an eligible employee, upon the expiration of medical leave, to be restored to the position held by the employee when the leave commenced.

There are two theories by which an aggrieved plaintiff may recover under the FMLA – the entitlement/interference theory and the retaliation/discrimination theory.  *Arban v. West Publishing Corp.*, 345 F. 3d 390, 400-01 (6th Cir. 2003).  In the instant case, Plaintiff asserts both an interference FMLA claim and a retaliation FMLA claim.  The Court will address the merits of each claim in turn.

### 1. Plaintiff's FMLA Interference Claim

The FMLA entitlement theory arises out of sections 2615(a)(1) and 2614(a)(1) of the statute. Section 2615(a)(1) states that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." 29 U.S.C. § 2615(a)(1). Section 2614(a)(1) states that "any eligible employee who takes leave . . . shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position." 29 U.S.C. 2614(a)(1). If an employer interferes with either an employee's right to leave or reinstatement subsequent to the leave, he or she is liable under the FMLA. See *Arban*, 345 F. 3d at 401.

However, the right to reinstatement "shall not be construed to entitle any restored employee to . . . any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." Id. (citing 29 U.S.C. § 2614(a)(3)(B). Accordingly, such an employee may be lawfully terminated from employment and prevented from exercising his or her right to reinstatement, but only if the termination "would have occurred regardless of the employee's request for or taking FMLA leave." *Id*. (citing *Gunnell v. Utah Valley State Coll.*, 152 F. 3d 1253, 1262 (10th Cir. 1998). Defendant must demonstrate that Plaintiff's termination would have occurred even if she had not invoked her rights under the FMLA. See 29 C.F.R. § 825.216(a) (the employer has the burden of demonstrating that the "employee would not otherwise have been employed at the time reinstatement is requested . . . ." *Id.*

To state a prima facie FMLA interference claim, a plaintiff must show that: (1) she

is an eligible employee; (2) the defendant is a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave the defendant notice of his intent to take leave; and (5) the defendant denied her FMLA benefits to which she was entitled.  *Hoge*, 384 F. 3d at 244; *Arban v. W. Publ'g Co*., 345 F.3d 390, 401 (6th Cir. 2003); *Cavin*, 346 F.3d at 719.

In the instant case, Plaintiff's FMLA interference claim is based upon indirect evidence of discrimination as discussed *supra*.  In FMLA cases that rely upon indirect evidence, the three-step *McDonnell Douglas* paradigm governs the Court's analysis. *See Skrjanc v. Great Lakes Power Service Co.,* 272 F.3d 309, 315 (6th Cir. 2001).

Under the *McDonnell Douglas* framework, Plaintiff must make a *prima facie* showing that: (1) she engaged in a statutorily-protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.  *Skrjanc.,* 272 F.3d at 314-15. If Plaintiff meets her burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.* If the defendant articulates such a reason, then the plaintiff has the burden of showing that the articulated reason is a pretext for discrimination. *Id.*  Plaintiff can meet her burden in establishing pretext by providing evidence that establishes the proffered reason: (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct."  *Johnson v. Kroger*, 319 F.3d 858, 866 (6th Cir. 2003).

There is evidence in the record to support that Plaintiff engaged in statutorily protected activity because she requested FMLA leave.  Neither party disputes that Plaintiff requested FMLA leave in accordance with the law.  Thus, the Court now turns to the issue

of whether Plaintiff can establish that Defendant interfered with her right to take FMLA leave, *i.e.,* whether an adverse employment action occurred.

Terminating an employee prior to the employee taking FMLA leave may constitute a denial of FMLA benefits. *Arban*, 345 F.3d at 401 (explaining that "the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her" seeking leave); see also, *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 727-28 (6th Cir. 2003) citing *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001) (explaining that to prevail on an FMLA interference claim, an employee "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her"). Thus, "a termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA." *Id.* citing *Barnett v. Revere Smelting & Refining Corp.*, 67 F. Supp. 2d 378, 388 (S.D.N.Y. 1999). In this instance, neither party disputes that Plaintiff's employment with Defendant was terminated shortly after she requested FMLA leave. Thus, the Court finds that Plaintiff has presented sufficient evidence to support a finding that she suffered an adverse employment action.

Thus, the Court now turns to whether Plaintiff can establish that her planned FMLA leave played any role in Defendant's decision to terminate her employment. In order to establish a causal link, the plaintiff must "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.' " *Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990) (*quoting Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982)).

Here, Plaintiff contends that the temporal proximity between her FMLA request and her termination constitutes evidence to support her FMLA interference claim. The United States Court of Appeals for the Sixth Circuit has stated that while "'temporal proximity alone will not support an inference in the face of compelling evidence' to the contrary, 'the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection.'" *Ford,* 305 F.3d at 554-55 (quoting *Moon,* 836 F.2d at 229); *see also DiCarlo v. Potter,* 358 F.3d 408, 421 (6th Cir. 2004) ("this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.").

Thus, in certain instances, temporal proximity is sufficient indirect evidence of causation to satisfy this element. *See Singfield v. Akron Metro. Housing Auth*., 389 F.3d 555, 563 (6th Cir. 2004) (finding three months lapse between the employee's protected act and the termination of his employment to be sufficient to establish causation at summary judgment stage).

In this case, neither party disputes that Plaintiff was terminated a few weeks after she informed her supervisors of her need for FMLA leave. Taking the evidence in the light most favorable to the Plaintiff, this temporal proximity supports a finding that Plaintiff's request for FMLA leave played a role in terminating her position. *Stephens v. Neighborhood Svs. Org.*, No. 07-11908, 2008 U.S. Dist. LEXIS 63279, *17 (E.D. Mich. August 19, 2008) ("[t]his temporal proximity is 'unduly suggestive' and is sufficient to

establish a prima facie case of discrimination. . . ."). Accordingly, the Court finds that Plaintiff has presented evidence to support a *prima facie* FMLA interference claim.

Defendant, however, has presented substantial evidence that supports a legitimate non-discriminatory reason for terminating Plaintiff's employment. Neither party disputes that Plaintiff had the least technical certifications and the lowest evaluations among Defendant's desktop specialists. Defendant also presented evidence that its decision to terminate Plaintiff's employment was due to a reduction in force. Plaintiff's duties were largely outsourced or moved back to Defendant's Houston, Texas office. Accordingly the Court finds that Defendant has met its burden in rebutting Plaintiff's *prima facie* claim.

The burden now shifts to Plaintiff to establish that Defendant's reduction in force was merely a pretext for discrimination. A plaintiff may establish pretext by showing that the defendant's articulated legitimate, non-discriminatory reasons: (1) had no basis in fact; (2) was not the actual reason motivating the decision; or (3) was insufficient to justify the decision. *Carter v. University of Toledo*, 349 F. 3d 269, 274-75 (6th Cir. 2003)

Defendant contends that it chose to terminate Plaintiff as part of its its reduction in force because she had the lowest evaluation scores and was the least qualified among her peers. Plaintiff contends that her review was unjustly lowered as pretext for her firing. She has, however, testified to the contrary and admitted that she did not believe her evaluation score was lowered because she was pregnant or requested FMLA leave. Pl.'s Dep. at 156. Thus, this argument does not support Plaintiff's pretext allegation.

When "a plaintiff is terminated pursuant to a reduction in force, he or she has a greater burden to show that the termination was discriminatory." *Grzybowski v. Daimler Chrysler Svs. N. Am.*, 2006 U. S. Dist. LEXIS 30205, at * 12-13 (E.D. Mich. May 17, 2006).

In the Sixth Circuit, a reduction in force need not be driven by "economic necessity." *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (1990). As the *Barnes* court described "[a] work force reduction situation occurs when *business considerations* cause an employer to eliminate one or more positions within the company." *Id*. (emphasis added).

In fact, the *Barnes* court specifically noted that "a reduction in force generally is involved when a fired employee's work is redistributed among remaining workers." *Id*. As the Sixth Circuit provided in *Barnes* to clarify what constitutes a true work force reduction case:

> An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

896 F.2d at 1465.

Although there is significant evidence that Plaintiff had the lowest evaluation scores and technical qualifications among her peers, there is also evidence that the claimed reduction in force never occurred and was pretextual. Stubblefield testified that she "wasn't involved with the actual termination." Stubblefield Dep. at 34. She also testified that the reduction in force was "a surprise to her." *Id*. Hunter, Plaintiff's direct supervisor, also testified that he had no knowledge of the reduction in force and contacted Stubblefield after Plaintiff's termination to determine how the company would deal with Plaintiff's telecommunications duties. Hunter Dep. 54-55, 61. These issues suggest that the business considerations of the company, namely how Plaintiff's duties would be

redistributed, were not considered at the time the decision to terminate Plaintiff was made. There is also evidence that Plaintiff was replaced after her termination. Although Defendant contends Plaintiff's duties were outsourced, it admits that some of Plaintiff's duties were given to Jennifer Lehmann, an administrative assistant in Defendant's Houston, Texas office. This evidence indicates that Lehmann may have been reassigned to Plaintiff's position. Thus, taking all of this evidence in the light most favorable to Plaintiff, a reasonable fact-finder could conclude that Defendant's alleged reduction in force has no basis in fact, and thus, was merely pretext for Plaintiff's termination. *Compare Grzybowski,* 2006 U.S. Dist. LEXIS 30205, at * 15-16 (a reduction in force occurred when "[n]oone was hired to perform Plaintiff's duties; nor was anyone reassigned to Plaintiff's position."). Accordingly, the Court will **DENY** Defendant's Motion for Summary Judgment as to Plaintiff's FMLA interference claim.

### 2. Plaintiff's FMLA Retaliation Claim

Plaintiff also alleges that Defendant retaliated against her for exercising her FMLA rights. The burden-shifting test in *McDonnell Douglas* applies, as Plaintiff relies on indirect evidence as proof in support of her FMLA retaliation claim. *See Skrjanc*, 272 F. 3d at 313-16. As such, Plaintiff must first establish a prima facie case, which requires that she prove that: (1) she availed herself of a protected right under the FMLA by notifying Defendant of her intent to take leave; (2) she suffered an adverse employment action; and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *Edgar*, 443 F. 3d at 508. If Plaintiff succeeds in proving her prima facie case, then the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for her termination. *Skrjanc*, 272 F. 3d at 315. Once Defendant

provides a legitimate, nondiscriminatory reason for Plaintiff's termination, then Plaintiff must demonstrate that the reason is pretext. *Id*.

There is no dispute that Plaintiff availed herself of a protected right under the FMLA when she requested FMLA leave. *Shields v. Fox Television Station, Inc*., No. 98-6689, 2000 U.S. App. LEXIS 10791, 2000 WL 658054 at *3 (6th Cir. 2000) ("Making a request for leave is relevant to a claim for retaliation under the FMLA."). Neither party disputes that Plaintiff suffered an adverse employment action through her termination. Instead the issue is whether Plaintiff has presented sufficient evidence of a causal connection between the exercise of her rights under the FMLA and her termination. Akin to Plaintiff's FMLA interference claim, Plaintiff claims Defendant retaliated against her by terminating her employment shortly after she requested FMLA leave. Evidence that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000) (citing *Moon v. Transp. Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir. 1987)); *see also Ford v. GMC,* 305 F.3d 545, 554-55 (6th Cir. 2002)). It is evident that "proximity in time can raise a *prima facie* case of retaliatory discharge." *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 826 (6th Cir. 2002); *Shepard v. Good Samaritan Hosp.*, No. 1:08-cv-357, 2009 U.S. Dist. LEXIS 127405 at *31 (S.D. Ohio Oct. 13, 2009) (finding a *prima facie* case in part upon evidence of proximity in time between an employee's request for leave and her termination). Accordingly, the Court finds that Plaintiff met her *prima facie* burden. Defendant, however, has also stated a legitimate, non-discriminatory reason for the elimination of Plaintiff's position, namely that Plaintiff was terminated in a reduction in force because she had the lowest evaluation scores and least qualified among her peers.

The burden now shifts to Plaintiff to establish that Defendant's reduction in force was merely pretext for discrimination. A plaintiff may establish pretext by showing that the defendant's articulated legitimate, non-discriminatory reason: (1) had no basis in fact; (2) was not the actual reason motivating the decision; or (3) was insufficient to justify the decision. *Carter*, 349 F. 3d at 274-75.

Similar to the facts supporting Plaintiff's entitlement/interference claim, Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether Defendant's proffered reason for her termination was pretext. The evidence that the business considerations of the company, namely how Plaintiff's duties would be redistributed, were not considered when Plaintiff was terminated. There is also evidence that Plaintiff was replaced after her termination. Taking the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant's reason for terminating Plaintiff was pretext. Accordingly, the Court will **DENY** Defendant's Motion for Summary Judgment as to Plaintiff's FMLA retaliation claim.

### B.     Plaintiff's THRA ("Pregnancy Discrimination") Claim

Plaintiff also alleges that Defendant violated the THRA by discriminating against her because she was pregnant.

The Tennessee Human Rights Act is a comprehensive anti-discrimination statute. *See Carr v. United Parcel Serv.*, 955 S.W.2d 832, 834 (Tenn. 1997). It is intended to further the policies of the federal Civil Rights Acts of 1964, 1968, and 1972, including the Pregnancy Discrimination Act of 1978 ("PDA"). *See* Tenn. Code Ann. § 4-21-101(a)(1); *Mayberry v. Endocrinology-Diabetes Assocs.*, 926 F. Supp. 1315, 1326-27 (M.D. Tenn. 1996). Accordingly, the Act proscribes discriminatory employment practices with respect

to compensation, terms, conditions, or privileges of employment. *See* Tenn. Code Ann. § 4-21-401(a)(1).

Although the Act's wording differs slightly from the language of Title VII of the Civil Rights Act of 1964, it is clear that the Tennessee General Assembly intended that the Act would be coextensive with federal law. *See Carr v. United Parcel Serv.*, 955 S.W.2d at 834. Accordingly, Tennessee courts may appropriately look to decisions of federal courts construing Title VII when analyzing claims under the Act. *See Weber v. Moses*, 938 S.W.2d 387, 390 (Tenn. 1996). These federal precedents do not, however, bind or limit Tennessee's courts in giving the fullest possible effect to Tennessee's own human rights legislation. *See Carr v. United Parcel Serv.*, 955 S.W.2d at 835.

As originally enacted in 1964, Title VII prohibited the discharge of an employee on the basis of race, color, religion, sex, or national origin. In 1976, the United States Supreme Court held that Title VII could not be extended to prohibit discrimination based on pregnancy because it made no mention of pregnancy. *See General Elec. Co. v. Gilbert*, 429 U.S. 125, 145-46, 97 S. Ct. 401, 412-13, 50 L. Ed. 2d 343 (1976). Congress responded by amending Title VII with the Pregnancy Discrimination Amendment ("PDA"). As the Supreme Court later observed, the PDA was intended to overrule its *Gilbert* decision. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 670 (1983).

The PDA amended Title VII by providing that the terms "because of sex" or "on the basis of sex" in Title VII shall include "on the basis of pregnancy, childbirth or related medical conditions." *See* 42 U.S.C.A. § 2000e(k) (West 1994); *Soreo-Yasher v. First Office Mgmt.*, 926 F. Supp. 646, 649 (N.D. Ohio 1996); *Mayberry*, 926 F. Supp. at 1322. It

provided no new substantive rules governing discrimination based on pregnancy but rather brought discrimination on the basis of pregnancy within the existing Title VII statutory framework prohibiting employment discrimination based on sex. *See Grant v. General Motors Corp.*, 908 F.2d 1303, 1307 (6th Cir. 1990); *Mayberry*, 926 F. Supp. at 1322. Thus, PDA claims are analyzed just like any other Title VII discrimination claim. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998); *Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996).

The PDA does not require employers to make it easier for pregnant employees to work or to treat them specially. *See Maldonado v. U.S. Bank*, 186 F.3d 759, 762-63 (7th Cir. 1999); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir. 1998). It does, however, require employers to treat pregnant employees the same as other employees on the basis of their ability or inability to work. *See* Reva B. Siegel, Note, *Employment Equality Under the Pregnancy Discrimination Act of 1978*, 94 Yale L.J. 929, 931 (1985). Thus, as noted in a leading case, the PDA requires employers to ignore an employee's pregnancy as far as is practically possible. *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994).

Under the PDA, an unlawful employment practice occurs whenever pregnancy alone is a motivating factor for an adverse employment action. *See Hunt-Golliday v. Met. Water Reclamation Dist.*, 104 F.3d 1004, 1010 (7th Cir. 1997). Thus, in order to prevail with a disparate treatment PDA claim, an employee must demonstrate that she was treated differently than other temporarily disabled employees because of her pregnancy or pregnancy-related condition. *See Maldonado*, 186 F.3d at 763; *Deneen v. Northwest*

*Airlines, Inc.*, 132 F.3d 431, 435 (8th Cir. 1998); *Byrd v. Lakeshore Hosp.*, 30 F.3d 1380, 1382 (11th Cir. 1994); *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1511-12 (9th Cir. 1989).

The burden of proving the ultimate issue of discrimination always falls on the employee. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, (1981); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 1999 Tenn. App. LEXIS 110, *15, 1999 WL 86977, at *6 (Tenn. Ct. App. 1999), *perm. app. denied*, (Tenn. Sept. 13, 1999); *Brenner v. Textron Aerostructures*, 874 S.W.2d 579, 583 (Tenn. Ct. App. 1993). Discrimination claims brought in accordance with the PDA are no exception. Thus, an employee asserting a PDA claim has the ultimate burden of establishing that her employer discriminated against her "because of" her pregnancy. See 42 U.S.C.A. § 2000e-2(a)(1)&(2) (West 1994); *DeJarnette*, 133 F.3d at 297; *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995).

Pregnancy discrimination may be established in two ways. First, using the direct method, a PDA plaintiff may present enough evidence to demonstrate that the adverse employment action was the result of intentional discrimination. *See Maldonado,* 186 F.3d at 763. This method focuses primarily on the discriminatory conduct. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1185 (2d Cir. 1992). Employees using this method may present either direct or circumstantial evidence of intentional discrimination or a combination of both. *See Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999); *Kennedy*, 140 F.3d at 722-23. Direct evidence of intentional discrimination includes an acknowledgment by an employer of discriminatory intent. Circumstantial evidence of discrimination includes ambiguous statements, suspicious timing, and instances in which

similarly situated, non-pregnant employees received systematically better treatment. *See Marshall,* 157 F.3d 520, 525 (7th Cir. 1998); *Troupe*, 20 F.3d at 736.

Plaintiff has not presented sufficient evidence to establish pregnancy discrimination under the direct method. Plaintiff contends that Hunter's remark in which he asked whether she would be returning following her maternity leave is direct evidence of discrimination. This "isolated and ambiguous comment," however, is "insufficient, standing alone, to prove an employer's discriminatory intent." *Spann*, 26 S.W. 3d at 466. For a comment to "be germane, they must be contemporaneous or causally related to the employer's decision-making process." *Id.* citing *Wichmann v. Bd. of Trustees of Southern Ill. Univ.*, 180 F.3d 791, 801 (7th Cir. 1999).

When considered in the context in which the remark was made, Hunter's comments provide no evidence of discriminatory intent. Mere "concern about [a pregnant employee's] absences after she announced she was pregnant does not give rise to an inference of pregnancy discrimination." *Spann*, 26 S.W. 3d at 466. Similarly, inquiring into whether an employee intends to return to work following a maternity leave does not give rise to an inference of pregnancy discrimination. In fact, the parties do not even dispute that Hunter played no role in deciding whether Plaintiff should be terminated. Thus, Plaintiff has failed to establish that discrimination under the direct method.

The second way to establish discrimination is the indirect method. The indirect method embodies the now ubiquitous burden-shifting approach set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this method, once a PDA plaintiff makes out a prima facie case of discrimination, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for the plaintiff's treatment. If the employer offers

a legitimate, nondiscriminatory reason for its treatment of the plaintiff, the burden shifts back to the plaintiff to show that the employer's proffered reason is pretextual. *See Maldonado*, 186 F.3d at 763; *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241-42 (7th Cir. 1996). In the instant case, Plaintiff has not presented enough evidence to demonstrate that the adverse employment action, namely her termination, was the result of intentional pregnancy discrimination.

Plaintiff does, however, argue that the circumstantial evidence supports a finding that Defendant discriminated against her because she was pregnant. A plaintiff using this indirect method to establish a prima facie case of pregnancy discrimination must show: (1) that she was pregnant; (2) that she met her employer's expectations; (3) that she was subjected to an adverse employment action; and (4) that there is a nexus between her pregnancy and the adverse employment action. *See Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1148 (10th Cir. 1999); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998); *Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d at 413; *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 421 (1st Cir. 1996). A plaintiff may establish the connection between her pregnancy and the adverse employment action by demonstrating that comparable non-pregnant employees received more favorable treatment. *See McDonnell Douglas,* 411 U.S. at 802; *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1224 (6th Cir. 1996); *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1538 (11th Cir. 1987).

In the instant case, neither party disputes that Plaintiff was pregnant and suffered an adverse employment action, namely, the termination of her employment. The parties do dispute whether Plaintiff had competently performed her duties and whether there was a nexus between her pregnancy and Defendant terminating her employment. Plaintiff

contends that her reviews, which were all consistently in the "meets expectations" range, constitute evidence that she fulfilled her duties competently. Defendant disputes this characterization of Plaintiff's performance and points to evidence in which Stubblefield and Hunter both repeatedly asked Plaintiff to improve her computer software and hardware skills by obtaining certain certifications. Defendant also points to certain communications issues expressed in Plaintiff's personnel review file. Whether or not a plaintiff makes a *prima facie* case, however, must be ascertained "by weighing plaintiff's evidence that [she] was meeting [her] employer's legitimate expectations, not by considering the nondiscriminatory reasons produced by the defendant as its reason for terminating [her]." *Cline v. Catholic Diocese*, 206 F. 3d 651, 662-63 (6th Cir. 2000). Thus, Plaintiff's evidence that she was consistently rated within the "category of 'meets expectations' " is sufficient to meet this burden. *Id.*

To establish the fourth element, *i.e.*, a similarly-situated non-pregnant employee received better treatment, Plaintiff must present evidence that Defendant treated her differently from similarly situated employees or that the adverse action was taken shortly after the Plaintiff's exercise of protected rights." *Nguyen*, 229 F.3d at 563. As discussed *supra*, Hunter's comments concerning Plaintiff's maternity leave do not provide support for Plaintiff's claim that she was treated differently because she was pregnant. Plaintiff's contention that Stubblefield's decision to lower a portion of her evaluation is indirect evidence of pregnancy discrimination is similarly without merit. Stubblefield also lowered the evaluation of two other employees in Defendant's Information Technology department, including Damron, a desktop support specialist. Stubblefield Dep. 27. Thus, the adverse treatment, namely the lowering of personnel review scores, was suffered by non-pregnant

employees who held the identical position as Plaintiff. Moreover, Plaintiff admitted that she did not believe that her evaluation score was lowered because she was pregnant, a woman or sought FMLA leave. Payne Dep. 156.

Unlike Plaintiff's FMLA claims, in which the time period between her requesting FMLA leave and her termination was roughly a few weeks, Defendant knew Plaintiff was pregnant for nearly six months before it decided to terminate her employment. Compl. ¶¶ 6-15, 25.) Based on the Court's analysis of existing Sixth Circuit case law, the temporal relationship between Defendant's knowledge of Plaintiff's pregnancy and the adverse employment action is not sufficient to warrant an inference of retaliation. *DiCarlo v. Potter,* 358 F.3d 408, 421 (6th Cir. 2004) (holding that a time period of less than one month between the employee's protected activity and the adverse employment action in that case was sufficient to give rise to an inference of a causal connection between them); *see also Asmo v. Keane, Inc.,* 471 F.3d 588, 594 (6th Cir. 2006) (finding that temporal proximity of less than two months was "sufficient to establish a link between [plaintiff's] pregnancy and her termination for the purposes of a prima facie case" in the context of a pregnancy discrimination claim); *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 563 (6th Cir. 2004) (holding that temporal proximity of less than three months was sufficient to give rise to the inference of a retaliatory motive).

Thus, the Court finds that Plaintiff has failed to meet her *prima facie* burden with respect to her pregnancy discrimination claim under the THRA. Accordingly, the Court will **GRANT** Defendant's Motion for Summary Judgment with respect to Plaintiff's pregnancy discrimination THRA claim.

### C.    Plaintiff's THRA ("Maternity Leave") Claim

Count II of the Complaint alleges that Defendant violated the maternity leave statute in the THRA, Tenn. Code Ann. § 4-21-408, by interfering with and retaliating against Plaintiff's attempt to use maternity leave.  Compl. ¶¶ 46-53.

The Tennessee Maternity Leave statute provides, in pertinent part:

> Employees who have been employed by the same employer for at least twelve (12) consecutive months as full-time employees, as determined by the employer at the job site or location, may be absent from such employment for a period not to exceed four (4) months for adoption, pregnancy, childbirth and nursing an infant, where applicable, referred to as "leave" in this section...

Tenn. Code Ann. § 4-21-408(a).

To date, no court has considered what legal standards govern a court's analysis of a plaintiff's claim under the Tennessee maternity leave statute.  The parties contend that the Court should apply the standards governing the FMLA to the Tennessee maternity leave statute.[1]  The Tennessee maternity leave statute, however, is part of the Tennessee Human Rights Act.  *George v. Russell Stover Candies, Inc.*, 106 Fed. App'x 946, 959 (6th Cir. July 14, 2004) (identifying Tenn. Code. Ann. § 44-21-408(a) as part of the Tennessee Human Rights Act.).  An analysis of a plaintiff's claims under the Tennessee Human Rights Act, title 4, chapter 21 is identical to that under Title VII of the federal Civil Rights Act, 42

---

[1] The Court notes that the THRA contains no reference to the protections afforded to employees under the FMLA.  The expression-exclusion rule of statutory interpretation, which holds that expressing one item of an associated group excludes another left unmentioned, depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which are abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded. *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 81 (2002).  If the Tennessee legislature intended to include FMLA protections within the ambit of the THRA, it could have done so explicitly.  Accordingly, the Court does not believe that the legal standards governing the FMLA have any application to the THRA maternity leave statute.

U.S.C. § 2000e. *Davis v. Modine Mfg. Co.*, 979 S.W.2d 602, 1998 Tenn. App. LEXIS 44 (Tenn. Ct. App. 1998).

Thus, Tennessee courts may appropriately look to decisions of federal courts construing Title VII, 42 U.S.C. § 2000e et seq., when analyzing claims under the Tennessee Human Rights Act, compiled in T.C.A. § 4-21-101 et seq. Such a statutory interpretation is evidenced by the Tennessee General Assembly's explicit mention that the THRA provides "for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968, the Pregnancy Amendment of 1978, and the Age Discrimination in Employment Act of 1967." Tenn. Code Ann. § 4-21-101(a).

When a plaintiff's Tennessee Maternity Leave statutory claim and a discrimination claim under the Pregnancy Discrimination Act arise out of the same set of underlying facts and allegations of discrimination, the standards of liability are sufficiently similar that their disposition should be the same. *Mayberry v. Endocrinology-Diabetes Assocs.*, 926 F. Supp. 1315, 1996 U.S. Dist. LEXIS 7588 (M.D. Tenn. 1996) (Where plaintiff's employment discrimination claim under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) was denied because she failed to establish that she was treated any differently from non-pregnant employees, her claim under the Tennessee Human Rights Act, compiled in T.C.A. § 4-21-101 *et seq.*, was dismissed since the analysis under the federal law would be the same under the state law.).

In this instance, Plaintiff's allegations concerning her THRA pregnancy discrimination claim and her Tennessee Maternity Leave statutory claim both arise out of the same set of operative facts. As discussed above, however, Plaintiff has failed to meet her *prima facie* burden in establishing her THRA pregnancy discrimination claim. Thus,

Plaintiff's Tennessee maternity leave statutory claim must also be dismissed.  Accordingly, the Court will **GRANT** Defendant's Motion to Dismiss with respect to Plaintiff's Tennessee maternity leave statutory claim.

### D.     Plaintiff's Equal Pay Act Claim

Count IV of the Complaint asserts a cause of action against Defendant under the Equal Pay Act of 1963, 29 U.S.C. 206, *et seq.*.  Compl. ¶¶ 62-72.  Plaintiff contends that Defendant paid her at a lesser rate than similarly situated male employees for equal work on jobs that required equal skill, effort, and responsibility and which were performed under similar working conditions.  *Id.* ¶ 68.  Plaintiff also contends that Defendant was aware of or disregarded the possibility of an existing wage disparity between Plaintiff and her male comparators but did not correct the alleged wage disparity.  *Id.* ¶ 69.  Defendant admits that Plaintiff held the same position as Damron and Shade and that she was paid less than they were.  Nevertheless, Defendant contends that Plaintiff cannot meet her *prima facie* burden under the Equal Pay Act because Damron and Shade performed different tasks which required substantially different skill sets, which Plaintiff lacked.  Def.'s Br. at 28.

The Equal Pay Act prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work.  *Buntin v. Breathitt County Bd. of Educ,* 134 F.3d 796, 799 (6th Cir.1998).  To establish a prima facie case under the Equal Pay Act, a plaintiff must present evidence that the defendant-employer paid employees of one sex less than employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. . . ." 29 U.S.C. § 206(d)(1).

" 'Equal work' does not require that the jobs be identical, but only that there exist ' substantial equality of skill, effort, responsibility and working conditions.' " *Buntin,* 134 F.3d at 799 (quoting *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir. 1981)); *accord Kovacevich v. Kent State Univ.,* 224 F.3d 806, 826 (6th Cir. 2000). In determining whether there is substantial equality in these respects in a given case, it is necessary to make ""an overall comparison of the work, not its individual segments."" *Id.* (quoting *Odomes,* 653 F.2d at 250).

Even when there exists a genuine dispute regarding the plaintiff's prima facie case under the Equal Pay Act, the defendant may still be entitled to summary judgment by proving one of the affirmative defenses delineated in the Act. In such a scenario, the burden shifts to the defendant to show that the pay differential is justified under one of the following four affirmative defenses: (1) a seniority system; (2) a merit system; (3) a system based on quantity or quality of production; or (4) any factor other than gender. 29 U.S.C. § 206(d)(1); *accord Kovacevich,* 224 F.3d at 826; *Buntin,* 134 F.3d at 799. Because these explanations are affirmative defenses, the defendant bears the burden of proof by a preponderance of the evidence. *Kovacevich,* 224 F.3d at 827-27; *Buntin,* 134 F.3d at 799-800; *E.E.O.C. v. Romeo Cmty. Schs.,* 976 F.2d 985, 988 (6th Cir.1992).

In this instance, Plaintiff is unable to establish that her job requirements and duties were the same as her comparators. As discussed in extensive detail *supra*, the overwhelming majority of the time Plaintiff worked for Defendant she performed telecommunication and administrative tasks. Payne Dep. at 20-21. In contrast, Damron and Shade obtained additional computer software and hardware certifications, which resulted in them being paid more than Plaintiff. Hunter Dep. at 59, 70-71. Although

Plaintiff was encouraged to obtain these computer software and hardware skills and certifications, she opted to perform primarily telecommunications tasks and limited her exposure to computer software and hardware desktop duties. Neither party disputes that Plaintiff had fewer computer software and hardware certifications than Damron and Shade. As a result of Plaintiff's lack of skill, she performed only very basic desktop functions, which the majority of an office's personnel could handle. Hunter Dep. 70. Plaintiff even admitted that she had no evidence that Defendant paid her less than similarly situated men because of her sex. Payne Dep. at 162.

Based on these facts alone, Plaintiff is unable to meet her *prima facie* burden. *Buntin,* 134 F.3d at 799 (to meet her *prima facie* burden, a plaintiff must demonstrate that an employers pays different wages to employees of opposite sexes for jobs the performance of which requires equal skill, effort and responsibility.). Accordingly, the Court will **GRANT** Defendant's summary judgment motion with respect to Plaintiff's Equal Pay Act claim.

### E. Plaintiff's THRA Sex Discrimination Claim ("Equal Pay")

Plaintiff also alleges an equal pay sex discrimination claim under the THRA. The THRA prohibits "discriminatory employment practices with respect to compensation, terms, conditions, or privileges of employment." *See* Tenn. Code Ann. § 4-21-401(a)(1). Although the Act's wording differs slightly from the language of Title VII of the Civil Rights Act of 1964, it is clear that the Tennessee General Assembly intended that the Act would be coextensive with federal law. *See Carr v. United Parcel Serv.*, 955 S.W.2d at 834. Accordingly, Tennessee courts may appropriately look to decisions of federal courts construing Title VII when analyzing claims under the Act. *See Weber v. Moses*, 938

S.W.2d 387, 390 (Tenn. 1996).

In this instance, Plaintiff's THRA sex discrimination claim, which is based upon unequal wages, fails as a matter of law.  When an Equal Pay Act claim and equal pay sex discrimination claim arise out of the same set of underlying facts and allegations of wage discrimination, the standards of liability are sufficiently similar that their disposition should be the same. *See Buntin*, 134 F.3d at 801 (where there is a genuine issue of fact concerning wage differential under the EPA, there is an issue of fact on the parallel Title VII claim); *Korte v. Diemer,* 909 F.2d 954, 957 (6th Cir. 1990) (jury verdict on EPA claim required finding for plaintiff on Title VII claim). In this case, Plaintiff's Equal Pay Act and equal pay sex discrimination claims arise out of the same facts and rest upon the same claim of unequal pay.  The Court has already concluded that Plaintiff cannot meet her *prima facie* burden in establishing a claim under the EPA.  Thus, Plaintiff's THRA equal pay sex discrimination claim must also be dismissed.   Accordingly, the Court will **GRANT** Defendant's Motion for Summary Judgment with respect to Plaintiff's equal pay sex discrimination THRA claim.

### F.	Plaintiff's THRA Retaliation Claim

The THRA prohibits retaliation against an employee who "has opposed a practice declared discriminatory by [the THRA], or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing." Tenn. Code Ann. § 4-21-301(1).  Thus, in order to establish a claim for violation of that section, a plaintiff must show that (1) he engaged in activity protected by statute; (2) his employer had knowledge of his exercise of protected activity; (3) the employer thereafter took an adverse employment action against him; and (4) a causal

connection exists between the protected activity and the adverse employment action. *Newsom v. Textron Aerostructures, a div. of Avco, Inc.,* 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995).

If a plaintiff succeeds in establishing each element of his *prima facie* case, then the burden shifts to his employer to articulate a legitimate, non-retaliatory reason for taking the adverse action. At that point, the burden shifts back to the plaintiff employee to demonstrate that the employer's proffered reason for termination was merely pretextual and that the adverse employment decision was motivated by a desire to retaliate against the employee. *Id.*

In the instant case, Plaintiff contends that she was retaliated against for "complaining that male co-workers were being paid at a higher rate than she." Pl.'s Resp. Br. at 25. Plaintiff argues that her termination, which occurred three weeks after she voiced her concerns, is sufficient evidence to support a finding of retaliation under the THRA. *Id.* Defendant contends that Plaintiff's single comment concerning her pay did not constitute a protected activity because the comment did not refer to being paid less than her male co-workers because she was a woman. Def.'s Br. at 24. Defendant also contends that Plaintiff cannot assert that her evaluation was changed in retaliation for her complaint because her single complaint about pay occurred on April 11, 2008 as she was being presented with her final evaluation. *Id.*

Defendant is correct that Plaintiff's general statement concerning her pay did not rise to the level of being a protected activity under the THRA. Plaintiff explicitly testified during her deposition that she did not complain to Hunter because she believed she was being paid less than her peers because she was a woman. Payne Dep. at 93. Plaintiff

admitted that she merely pointed out the difference in pay and wanted to know why. *Id.* "General grievances which are not related to discrimination cannot be the basis of a retaliation claim under the THRA." *Sawyer v. Memphis Educ. Ass'n*, No., 437-COA-R3-CV, 2006 Tenn. App. LEXIS 729, * 17-18 (Tenn. Ct. App. Nov. 14, 2006); *Moore v. Nashville Elec. Power Bd.,* 72 S.W. 3d 643, 656 (Tenn. App. Ct. 2001) ("These general grievances which are not related to discrimination cannot be the basis of a retaliation claim under the THRA."). Thus, the Court finds that Plaintiff cannot meet the first prong of her *prima facie* burden with respect to her THRA retaliation claim. Accordingly, the Court will **GRANT** Defendant's Motion for Summary Judgment with respect to Plaintiff's THRA retaliation claim.

**IV.     CONCLUSION**

For the reasons explained above, Defendant's Motion for Summary Judgment (Court Doc. 16) is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's THRA ("Pregnancy Discrimination") Claim, Plaintiff's THRA ("Maternity Leave") Claim, Plaintiff's THRA Retaliation Claim, and Plaintiff's EPA claims are hereby **DISMISSED WITH PREJUDICE.**  Plaintiff's FMLA Interference and Retaliation claims shall proceed to trial.

SO ORDERED this 6th day of July, 2010.


_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE